UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  09-60316-CR-COHN

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

FITZROY DANIEL SALESMAN,

        Defendant.

_____/

DEFENDANT'S MOTION TO DISMISS BASED UPON OUTRAGEOUS
GOVERNMENTAL MISCONDUCT IN VIOLATION OF THE DUE PROCESS
CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION

The Defendant, FITZROY SALESMAN, by and through his undersigned CJA counsel,

James S. Benjamin, Esq., Benjamin & Aaronson, P.A.,  files this motion seeking the dismissal of

the Indictment in the above-styled cause and states the following:

In United States v. Russell, 411 U.S. 423 (1973), the Supreme Court of the United States

noted  that it "may someday be presented with a situation in which the conduct of law

enforcement agents is so outrageous that the due process principles would absolutely bar the

Government from invoking judicial process to obtain a conviction.".  Id. at 431-32.  This Court is

now presented with such a fact situation and such a case.

FACTS

However, nothing herein should be taken as an admission that Fitzroy Salesman did in

fact commit any violation of law and to those charges brought against him, he still contends that

he is innocent of all.   The fact that Mr. Salesman was not predisposed to commit any crime is

1

further evidence of and illuminates the Government's outrageous misconduct in this matter. Their violation of standards of justice and  due process of law illustrates why this case must be dismissed.  Mr. Salesman's lack of predisposition further shows the Government's misbehavior in this investigation and that the Government was not looking to prevent crime, to stop crime, to investigate crime, but rather to create crime where none existed.

The investigation and subsequent prosecutions of Fitzroy Salesman by the United States Government began for no apparent reason, or at least for no apparent justifiable reason.  Mr. Fitzroy Salesman was a City Commissioner for the City of Miramar, Florida, a duly elected politician with no blemishes on his record of service to the City and no scintilla of evidence that he was involved in any illegal activity in relation to his office, let alone bribery, extortion or honest services fraud.

For whatever reason, towards the end of 2004, the United States government singled out Mr. Salesman as a target of their diabolical and unsavory tactics to ensnare a law-abiding elected official.  Based upon no evidence of any intent to do any criminal wrongdoing and no proof that Mr. Salesman desired to be involved in any illegal activity, the United States government hired a confidential informant Alden Budhoo a member of the notorious BLOODS street gang with its criminal arms reaching from the east to west coast of the United States.  Mr. Budhoo, a felon convicted of gang related racketeering-conspiracy with predicate acts including robbery, kidnaping, assault and murder was paid by the United States government over $9,000.00  and possible other leniency that has not come to light, in order to ensnare Mr. Salesman, ruin his political career and put an unwarranted feather in the cap of the local Federal authorities.

Mr. Budhoo sought out Mr. Salesman.  Mr. Salesman did not know who Alden Budhoo

2

was until Alden Budhoo falsely claimed that he and his family had been active in Mr. Salesman's previous political campaigns.  Mr. Budhoo endeared himself to Mr. Salesman by telling Mr. Salesman that he had changed his life and that he was now attending culinary school.  He invited Mr. Salesman to a party that apparently was set up and paid for by the FBI with tax payers' money claiming it was to celebrate his culinary school accomplishments.

Mr. Salesman busy with his work as a city commissioner, although happy that Mr. Budhoo had changed his life around, had little time for Mr. Budhoo.  Mr. Salesman was always active in trying to advise the youth of his constituency.  Mr. Salesman tried to give Mr. Budhoo advise as to not waste the money he had saved but to invest it in real estate and certificates of deposit.  Mr. Budhoo then unsolicited by Mr. Salesman began contacting Mr. Salesman in attempts to sell him flat screened televisions and computers.  Repeatedly, Mr. Salesman rebuked these overtures.

At this point, all United States government undercover contact with Mr. Salesman should have ceased.  He wanted no part in buying these items.

In order to hound Mr. Salesman into this purchase, the Government sent Mr. Budhoo a known felon and gang member to Mr. Salesman's house unsupervised.  In order to facilitate this transaction, the United States government either violated State or possibly Federal law by dealing in stolen property or purchased these items at proper retail value using U.S. currency and tax payers' money in order to sell these items at a ridiculously  low cost rate to Mr. Salesman.  But for the Government's actions there would have been no transaction.  Further, Mr. Budhoo sold some of these items to a female friend of Mr. Salesman again at a cost which borders on a gift and again either violating State and Federal law or using U.S.  taxpayers' money for the

3

subterfuge.

Although there had been no evidence whatsoever that Mr. Salesman desired to purchase stolen items, the government literally forced this transaction to occur. At the point before this occurred the Government instructed Mr. Budhoo that he had to get Mr. Salesman to give him some money; even $50.00 to $100.00 for more than $4,000.00 worth of merchandise. Yet, even with the purchase of these alleged stolen items by Mr. Salesman, the Government had no knowledge that Mr. Salesman had any desire to be involved in bribery, extortion, or honest services fraud as a governmental official.

The Government apparently was not satisfied that Mr. Salesman was an honest man having numerous times attempted to dissuade Mr. Budhoo from selling him these items. Apparently the Government had decided that they had found someone that they wished to prosecute and decided that they were not going to let go.

Over the next four years, the United States government used all of its resources, thousands of man hours of Federal agents' time, paid informants thousands upon thousands of dollars in costs, thousands of dollars in meals, rented a yacht and its crew, made a donation of money to charities, galas, and even political campaigns in order to violate the due process rights of Mr. Salesman and to allegedly pay Mr. Salesman approximately $3,500.00. These actions by the United States government when looked at individually are disturbing, but when looked at collectively are outrageous and disgusting.

As said previously, and which cannot be emphasized enough, the seeking out of Mr. Salesman for prosecution when there was no evidence of any illegal activity on his part is outrageous governmental  misconduct. The repeated attempts to get Mr. Salesman to purchase

allegedly stolen items when the record clearly shows that he had no desire to purchase them is governmental misconduct.  The use of a member of the BLOODS gang and a convicted felon was outrageous.  The use of taxpayers' money to purchase goods to sell to Mr. Salesman and his female friend at virtually gift prices was also outrageous.  However, should these items have been stolen as purported by the agents of the U.S. government, then the government was in the business of dealing in stolen property which would constitute gross governmental misconduct. The Government's misconduct had just barely begun to touch the surface.

Over the next four years or so, the Government sought out to blemish the record of several of the most prestigious African-American elected officials in Broward County.  Even attending the Black Elected Officials Ball where they paid for a table and sought out African-American office holders to corrupt.  Not only was Fitzroy Salesman subject to their unwarranted investigation, but so was Dale Holness a Lauderhill City Commissioner; Hazel Rogers  a Lauderdale Lakes City Commissioner and Josephus Eggelletion a Broward County Commissioner.  It might be coincidental that this approximately four year investigation involved mostly African-American elected officials, but given the small number of African-American elected officials in Broward County and the methods used by the United States government to try and bring the honest elected officials, Salesman, Holness, and Rogers into corruption one must wonder and give this Court concern.

The Government's agents were introduced to Lauderhill Commissioner Dale Holness by Fitzroy Salesman.  There was nothing unsavory about that introduction as Mr. Salesman allowed Mr. Holness to know that he was working as a consultant for this alleged construction company. For whatever reason, apparently Commissioner Holness decided that he really didn't want

anything to do with facilitating work for this construction company. For numerous months, the undercover agents of the Government expressed to Fitzroy Salesman that he should contact Commissioner Holness and explain to Commissioner Holness that he would be financially rewarded for any work that they received from Lauderhill.

There was no evidence whatsoever that Commissioner Holness was predisposed or had any desire to receive kick-backs from any work done in Lauderhill. There is no evidence that Commissioner Holness had any desire to do anything of an illegal nature. Yet, the United States government on their own along with soliciting Fitzroy Salesman to do the same, reached out to Commissioner Holness to have him accept illegal kick-backs. The question still remains why? The obvious answer is that the U.S. government was in the business of trying to create crimes and to sully the reputation of another African American elected official.

The same conduct that the Government agents used in relation to Commissioner Holness was also used on another African American elected official, Hazel Rogers for the City of Lauderdale Lakes. Again, the Government had no indication whatsoever that Hazel Rogers had any desire to violate any law or that she was predisposed to. Rather, the Government reached out to try to put money in her pocket so that she would be guilty of a crime. Again, the question must be asked why? And again, the answer is the Government is not looking to prevent crime, but to create it.

Further, during the course of the investigation the United States government gave $5,000.00 to George Pedlar who was running for the Miramar City Commission. Mr. Pedlar also is African American. The Government gave Mr. Pedlar $5,000.00 to his personal accounts with the understanding that Mr. Pedlar would then loan that $5,000.00 to his campaign. The United

6

States government at that time knew very well that it was violating election law by donating more than $500.00 to a candidate.  The Government knew at that time very well that it was allowing Mr. Pedlar to violate election laws by then loaning that $5,000.00 to his campaign. That alone would be  egregious government misconduct, but when analyzing what the Government did it gets worse.

By the Government donating $5,000.00 to George Pedlar's campaign, the Government was getting actively involved in the local political process.  By that donation, the Government asserted its ability to influence the election in the City of Miramar.  There can be nothing more egregious in a democracy than the Federal Government using tax payers' funds to influence the outcome of an election.  It is irrelevant that Mr. Pedlar was not elected.  Rather, those funds were used and did take a part in the Miramar City Commission election.  In a democracy how can any conduct by the Government be more egregious.

As noted above, the United States government got involved in the electoral process for the City of Miramar.  Their actions may have affected the outcome of an election for a local City Commissioner.  Not only did the United States government get involved in elections, but they also interfered in the private sector.  The United States government actually secured bids for construction contracts for Target Construction who performed the work.  They took money away from other contractors who did wish to earn money through government contracts.  It is outrageous that the Government would endeavor into the private sector to the benefit of one company and to the detriment of other  hardworking men and women who were trying to earn a living.  By subsidizing Target Construction the U.S. Government was able to give Target Construction a competitive edge not available to other construction companies.  Further, the

7

principal of Target Construction was paid over $9,000.00 for his services.

During the four years of this investigation, on countless times Mr. Salesman told the Government agents that he desired not to take any funds for any work that he did while being a City Commissioner.  On numerous occasions, Mr. Salesman informed the United States agents that while he was a sitting City Commissioner the advice that he would give them would be for free.  However, on numerous occasions the Government interjected that they wished to pay him for any information that he had given them on contracts within the City of Miramar.  On numerous occasions, Mr. Salesman reiterated that they could donate to his charities or to his campaign but he would not take any money for his pocket.

Even though Mr. Salesman on numerous occasions stated that he had no desire to be involved in illegal activity, the Government through one of its key paid witnesses "Pat Lochrie" told Mr. Salesman that it was the Government's fraudulent company's desire to have everybody a "little pregnant".  Meaning, that it was the Government's desire that everyone involved with this fraudulent company do something illegal.

Mr. Salesman on numerous occasions told the undercover agents that they did not need to pay for this information or to do things illegally.  However, on numerous occasions, the Government imparted that is how they did business and how they wished business to go forward.  Throughout the four year period, the Government turned a casual friendship with Mr. Salesman where he was more than happy to do favors for people who had befriended him into one where like any organized crime ring they got their tentacles around him.

When Mr. Salesman was suspended twice from office and therefore was free to earn as a consultant money from this undercover construction company, Mr. Salesman was more than

8

happy to do so.  However, when he was reinstated to the seat on the City Commission, Mr. Salesman again expressed to these agents that any advice he gave them would be free.  The Government however was not happy with this arrangement and repeatedly sought to taint Mr. Salesman's desire to be honest in his services in order to make an arrest and ultimately a conviction.

The Government as stated previously hired in this ruse, a man by the name of Pat Lochrie.   Although they now classify Mr. Lochrie as a former confidential informant [DE 71], Mr. Lochrie did no such work.  He never gave any confidential information to the Government nor did he ever work as an informant.  Rather, Mr. Lochrie worked as a paid witness and was part of the investigation as integral as any of the agents.  Yet, the Government refuses to acknowledge how much was paid to Mr. Lochrie and they refuse to make him available.  The Government contends that he is a Irish national and outside their reach.  There is something totally unsavory about the United States government paying a foreign national to be involved in their investigation, to help create a crime, to be in actuality the most aggressive participant in trying to ensnare Mr. Salesman and then allowing him to scurry back to Ireland or globe trot around the world out of the reach of this Court and the Defendant.

The lengths that the Government went through in order to allegedly pay Mr. Salesman approximately $3,500.00 over a four year investigation were extraordinary.  Their tactics were unsavory and  illegal under our democracy and our Constitution.  This Court must step in and say enough is enough.  The Court is respectfully requested to hold the Government accountable to our standards of justice, fair play and due process.

<u>LEGAL ARGUMENTS</u>

9

The law is quite clear that this Court has the power to dismiss the Indictment in this cause when the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the Government from invoking judicial process to obtain a conviction.  (See, Russell, supra) The Defendant contends that, in fact, this Court not only has the power but under the circumstances outlined above, has the duty to do so.

In United States v. Bocra, 623 F.2d 281 (3 Cir. 1980), the Third Circuit affirmed a conviction for bribery although disapproving of the agent's conduct in forming a social relationship with the Defendant and cultivating a climate inducive to bribery.  The Court noted in Bocra that there was no evidence that the audit was intended to trap the tax payer into offering a bribe and that at most the agent did not discourage the bribery.  This case is in opposite to the facts involving Fitzroy Salesman.  Mr. Salesman was solicited for bribery by the United States agent on countless occasions and in fact expressed their desire to engage in illegal bribery with not only Mr. Salesman, but with other elected officials.

In the United States v.  Hunt, 749 F.2d 1078 (4th Cir. 1984) the Court held that due process was not violated by undercover FBI agents offering a State Court Judge bribes.  The lynchpin in this case seems to be the fact that the agents had received information that the Judge was open to bribery and that at no time were the proffered  bribes refused.  Contrary to the fact in Hunt, the Government had no information that Mr. Salesman was open to receiving bribes and on countless occasions, Mr. Salesman expressed that he would not receive unlawful money and only wanted to be paid for lawful consulting work.

There is the case of United States v. Garrett, 716 F.2d 257 (5th Cir. 1983) wherein undercover FBI agents established a fictitious insurance agency and offered the Defendant kick-

backs.  Due to the efforts of agents and the Defendants, the City of Houston purchased an insurance policy.  Although the Court upheld the conviction, Judge Tate in a footnote stated that in absence of binding precedent, he would have considered the Government's conduct violative of due process.

  The Court in United States v. Marcello, 537 F.2d 1364 (ED La. 1982) concluded that there was no outrageous governmental misconduct because the general thrust of the scheme and the specific direction it took and the details of its execution were provided by the Defendant. This case involved a conspiracy to bribe public officials in connection with the awarding of insurance contracts.  Unlike the fact in Marcello, the general thrust of this scheme was concocted by and created by the United States agents.  Unlike the facts in Marcello, the direction that this investigation took and the details of its execution was solely in the hands of the U.S. agents.

  The fact that the idea of the criminal scheme did not originate with the Government was a central part of the holding in United States v. Robinson, 763 F.2d 778 (6th Cir. 1985).  Unlike Robinson, the criminal scheme alleged in this matter and the subject of the Indictment against Mr. Salesman was originated by the United States government.  Unlike the facts in Robinson, Mr. Salesman had no intent on violating the law or being party to any bribery, extortion or honest services fraud prior to his introduction to the United States agents.

  In United States v. Murphy, 768 F.2d 1518 (7th Cir. 1985) the Court affirmed a conviction on bribery charges and ruled that the Federal Bureau of Investigations did not violate the due process right of the State Court Judge.  In coming to its conclusion, that Court noted that the investigation by the FBI did not interfere with the operation of the State Court.  Unfortunately, by the actions of the FBI, the  electoral system was influenced and was interfered with in this matter.

11

Money was donated to campaigns, used in those campaigns and interfered with the fundamentals of democracy.

Outrageous governmental misconduct as grounds for dismissal is still valid.  Since it is a valid point of law, there can be no case that speaks out for it to be employed and used as the one here against Fitzroy Salesman.  In a system based upon justice, a system called the justice system, justice in this case would be this Court invoking the due process clause of the Fifth Amendment and dismissing the charges against Fitzroy Salesman.

Respectfully submitted,

*s:/ James S. Benjamin,Esq.*
James S. Benjamin (Fla. Bar No. 293245)
sexlaw@bellsouth.net
Benjamin & Aaronson, P.A.
One Financial Plaza; Suite 1615
Fort Lauderdale, Florida 33394
Telephone:  954-779-1700
Facsimile:  954-779-1771
Attorney Defendant/SALESMAN

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 5, 2010, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on Jeffrey Kaplan, Esq. and Neil Karadbil, Esq., Assistant United States Attorneys, using CM/ECF.

*s:/ James S. Benjamin, Esq.*